IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Sirvante Brown, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.: 09 C 4316 |
| v. ) | |
| ) | Suzanne B. Conlon, Judge |
| District 299 – Chicago Public Schools *et al.* ) | |
| ) | |
| Defendants ) | |

## MEMORANDUM OPINION AND ORDER

Sirvante Brown has a learning disability. Since fifth grade, his education has been guided by an individualized education program ("IEP") that provides accommodations and services he is supposed to receive to account for his learning disability. In high school, Brown received mostly Ds and Fs in his classes. His mother requested a due process hearing in October of his junior year to review the adequacy and implementation of his IEP. The hearing officer found partially for Brown and partially for the school district and ordered tutoring as compensatory education. Unhappy with the result, Brown, through his mother, filed suit against the Illinois State Board of Education and District 299 of the Chicago Public Schools (identified in its filings as the Board of Education of the City of Chicago). He sought review of the hearing officer's findings under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, and he alleged violations of 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et*

1

*seq.*[1] The IDEA claim was dismissed as untimely because it was filed more than 120 days after the due process hearing. Brown voluntarily dismissed defendant Illinois State Board of Education. The Board of Education of the City of Chicago ("the school board") moves for summary judgment on the § 1983 and ADA claims.

## I. Section 1983 Claim

Before delving into the facts, the court first considers the school board's argument that Brown may not bring a § 1983 claim premised solely on an IDEA violation. The second amended complaint alleges the school board violated § 1983 by refusing to follow Brown's IEP, thus denying him a free appropriate public education.[2] 2d Am. Comp. ¶ 51. The school board contends this theory is invalid. The board asserts the IDEA remedial scheme precludes Brown from using § 1983 to remedy violations of the IDEA. According to the school board, § 1983 may be used to remedy constitutional but not statutory IDEA violations. The school board acknowledges that a Seventh Circuit case, *Marie O. v. Edgar*, 131 F.3d 610 (7th Cir. 1997), is seemingly on point and would allow the § 1983 claim. But it argues *Marie O.* is distinguishable.

---

[1] Title II of the ADA is in all relevant respects substantively the same as § 504 of the Rehabilitation Act. *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004). Cases applying the Rehabilitation Act are equally applicable. This opinion refers interchangeably to cases interpreting both statutes. The United States Attorney General has issued regulations interpreting ADA application to services by state and local governments. *See* 28 C.F.R. § 35.101 *et seq.* There are also regulations implementing the Rehabilitation Act specifically in the education context. 34 C.F.R. § 104.1 *et seq.* The court refers to the more specific regulations. *See Wisc. Comm. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 747 n.3 (7th Cir. 2006) (*en banc*) ("Courts tend to look to the Rehabilitation Act's implementing regulations in interpreting other disability laws such as the ADA and the FHAA").

[2] The complaint also alleges the school board disregarded the rights of disabled students under the IDEA by employing too few special education teachers. 2d Am. Compl. ¶ 50. Brown was allowed to proceed on a violation of his individual rights, not on allegations of systemic failure. *See* Dkt. No. 57, Mem. Op. & Order of 5/11/10, at pp. 3-4.

It urges this court to follow instead the Third Circuit's approach in *A.W. v. Jersey City Public Schools*, 486 F.3d 791 (3d Cir. 2007) (*en banc*). Brown argues *Marie O.* controls.

In 1970 Congress enacted the Education of the Handicapped Act[3] to assist the states in educating children with disabilities. 20 U.S.C. § 1400(d); *Smith v. Robinson*, 468 U.S. 992, 1009 (1984). The IDEA provides federal funds to assist states in educating handicapped students and creates an enforceable substantive right to a "free appropriate public education" under the equal protection clause. *Smith*, 468 U.S. at 1010. To protect disabled children's rights, the IDEA establishes a procedural mechanism beginning at the school level in developing an IEP and provides an administrative hearing to review a student's IEP and judicial review of that hearing. *Id.* at 1010-11.

The Supreme Court considered the relationship between the IDEA and § 1983 in *Smith v. Robinson*, 468 U.S. 992 (1984). The issue there was whether a plaintiff could bring an equal protection claim under § 1983 for the alleged denial of a free appropriate public education. The Court noted in a footnote that several courts of appeals, including the Seventh Circuit, held that a plaintiff could not use § 1983 for statutory violations of the IDEA. *Smith*, 468 U.S. at 1008 n.11 (citing *Anderson v. Thompson*, 658 F.2d 1205, 1214-17 (7th Cir. 1981)). The Court concluded the IDEA implemented disabled children's educational rights under the equal protection clause, and therefore the comprehensive remedial scheme in the IDEA precluded an equal protection claim under § 1983 to enforce the same rights. *Id.* at 1011-13.

---

[3] Since then, the statute has been renamed more than once. The court uses the current name, IDEA, to refer to prior versions of the statute.

In response to *Smith*, Congress enacted 20 U.S.C. § 1415(f)[4] to clarify that actions to protect the rights of children with disabilities may be maintained under the Constitution or federal laws, even if the IDEA protects the same rights. Section 1415(*l*) reads:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, . . . .

Several courts of appeals have considered how § 1415(*l*) affects the availability of remedies under § 1983. The Third Circuit, sitting *en banc*, held Congress intended § 1415(*l*) to overrule the part of *Smith* that precluded constitutional claims but did not intend § 1415(*l*) to allow a more expansive remedy under § 1983 for statutory violation of the IDEA. *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 803 (3d Cir. 2007) (*en banc*). The Third Circuit relied on *City of Rancho Palos Verdes*, 544 U.S. 113 (2005), in reinterpreting when a federal statute provides a remedy under § 1983. *A.W.*, 486 F.3d at 799-802. Under *Rancho Palos Verdes*, a key factor in deciding whether a § 1983 action may be based on private enforceable rights found in a federal statute is whether the underlying statute itself includes a private remedy. 544 U.S. at 121-22. If so, that remedy is presumed exclusive absent a "textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.* at 122. The Third Circuit held § 1415(*l*) did not provide a textual showing but was limited to allowing substantive claims derived from an independent source of law, even if those independent claims overlap with IDEA claims. *A.W.*, 486 F.3d at 803; *see Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 936-38 (9th Cir 2007) (§ 1983 action cannot be premised on IDEA violation); *Padilla ex rel. Padilla v. Sch.*

---

[4] Section 1415(f) has been recodified to § 1415(*l*). For convenience the current codification is cited.

4

*Dist. No. 1*, 233 F.3d 1268 (10th Cir. 2000) (same); *Sellers ex rel. Sellers v. Sch. Bd. of Manassas*, 141 F.3d 524 (4th Cir. 1998) (same). *But see Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir. 1987) (allowing § 1983 action premised on IDEA violation).

The Seventh Circuit considered the relationship between § 1983 and the IDEA only once since the passage of § 1415(*l*). *Marie O. v. Edgar*, 131 F.3d 610 (7th Cir. 1997). *Marie O.* allowed class-action plaintiffs to use § 1983 to force the state to comply with Subchapter III (then Part H) of the IDEA, a later-added provision requiring states accepting federal funding to provide services to disabled children ages 0 to 2 years old. *Marie O.* concluded the § 1983 suit was not inconsistent with the remedial scheme in Subchapter III. *Id.* at 621-22.

*Marie O.* analyzed a different part of the IDEA and a different type of requested relief, and therefore is not controlling. It is undisputed that the IDEA creates private enforceable rights under either Subchapter II (at issue here) or Subchapter III (at issue in *Marie O.*). Subchapters II and III are not subject to the same analysis for determining the availability of § 1983. *Cf. Blessing v. Freestone*, 520 U.S. 329, 341 (1997) (criticizing court of appeals for concluding "in sweeping terms that Title IV-D [of Social Security Act] creates enforceable rights" without distinguishing among "the numerous rights that might have been created" by the program (internal quotation marks omitted)). Each subchapter contains separate procedural safeguards. *Compare* 20 U.S.C. § 1415 (procedural safeguards for Subchapter II), *with* 20 U.S.C. § 1439 (procedural safeguards for Subchapter III). Therefore, the procedural safeguards in each subchapter should be analyzed separately to determine whether each remedial scheme precludes a § 1983 remedy.

Additionally, plaintiffs in *Marie O.* were seeking statewide relief. No individual plaintiff sought an adjudication of his or her specific right to a particular service under the IDEA. IDEA procedural safeguards are geared towards ensuring a particular child receives appropriate services; it is unclear whether an individual could use those procedures to challenge the statewide implementation of Subchapter III. *Cf. Weyrick v. New Albany-Floyd County Consol. Sch. Corp.*, No. 4:03-CV-0095-DFH-WGH, 2004 WL 3059793, at *17 (S.D. Ind. 2004) (Hamilton, J.) ("Courts have recognized that allegations of systemic flaws and patterns of illegality might support a finding of administrative futility or inadequacy and thus excuse administrative exhaustion under the IDEA") (citing *Beth v. Carrol*, 87 F.3d 80, 89 (3d Cir. 1996); *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303-04 (9th Cir. 1992)). Thus, the statutory procedures may not have afforded the *Marie O.* plaintiffs the relief they sought, leaving § 1983 as the only available vehicle to vindicate their rights.

Accordingly, the court declines to apply *Marie O.* to this case. The holding of *Anderson v. Thompson*, 658 F.2d 1205, 1214-17 (7th Cir. 1981), that § 1983 may not be used to remedy a statutory violation of an individual child's right to appropriate services under the IDEA, is unchanged by later law and is consistent with decisions by the Fourth, Ninth, and Tenth Circuits. This conclusion avoids the absurd result of allowing Brown to avoid the time limits in the IDEA by proceeding under § 1983. *See Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788, 796 (2009) (considering whether resort to § 1983 would "circumvent required [statutory] procedures" or "allow access to new remedies"); *Rancho Palos Verdes*, 544 U.S. at 124 (noting presumption that "limitations upon the remedy contained in the statute are deliberate and are not to be evaded through § 1983").

## II. ADA Claim

### A. Facts

Turning to Brown's ADA claim, the court derives the following facts from the parties' statements of uncontested facts. The school board argues the only relevant events occurred between October 24, 2006 and March 2009. It is uncontested that events before October 24, 2006 occurred more than two years before Brown's mother requested a due process hearing and are time barred. Events after March 2009 postdate the administrative hearing and are unexhausted. The court restricts consideration to events in that period, which corresponds roughly to Brown's freshman, sophomore, and junior years of high school. Because Brown is the nonmoving party, any disputed facts are resolved in his favor, and he receives the benefit of all reasonable inferences. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Brown attended Chicago public high schools from 2006 until his graduation in 2010. Def. Facts ¶¶ 1, 4. He has a learning disability that affects his reading skills and his ability to express his thoughts in writing. *Id.* ¶ 6. His reading, writing, and math skills were below average, but he has an IQ of 90 and a cognitive ability in the average range. *Id.* ¶ 7. Despite his learning disability, Brown was capable of succeeding in a college preparatory program with special education services. Pl. Facts ¶ 4. Yet he received mostly Ds and Fs in high school. *Id.* ¶¶ 21, 35. Brown was generally well-liked and personable, but he also had disciplinary and attendance problems. Def. Facts ¶¶ 32, 38, 54; Pl. Facts ¶ 7. Brown struggled to arrive at school on time; he arrived late to first period at least 50 times his freshman year. Def. Facts ¶¶ 32, 38.

In Brown's freshman year, he was placed in general education classes with extra support from a special education teacher and modifications for tests, homework, and assignments. Pl.

Facts ¶¶ 14-15. His IEP required a special education teacher to be present five days a week for part of his core academic classes. *Id.* In addition, the IEP allowed Brown to give oral responses to questions on tests, take his tests with a special education teacher, receive extended time on tasks, and have directions rephrased. *Id.* ¶ 15. A special education teacher was not present in Brown's classes the full five days a week, and not all of the other accommodations were consistently provided.[5] *Id.* Brown was provided extra time to complete his assignments if necessary and was given the option to retake tests. Def. Facts ¶ 43. Brown was responsible for scheduling a retake, but he rarely scheduled any. *Id.* Nor did he attend the before- and after-school tutoring available to him. *Id.* ¶ 41. Brown's mother complained to high school officials about the failure. Pl. Facts ¶ 16.

Brown's sophomore year IEP also called for placement in general education classes with support from special education teachers and other modifications. The IEP required a special education teacher to be present five days a week in Brown's core academic classes, but a special education teacher was provided at most two or three days a week. Pl. Facts ¶ 18. The IEP allowed Brown to use books on tape, which he never received. *Id.* ¶ 17. The IEP stated that Brown should test with a special education teacher, be allowed to retake tests orally, and receive written lecture notes, which a teacher would review orally with him. *Id.* ¶ 19. Brown did not

---

[5] Brown relies on his mother's deposition testimony to establish that the school did not fully comply with his IEP. The school board objects to her testimony on the ground that she lacks personal knowledge of what happened in her son's classes because she was not there. She explained in her deposition that she knew this from speaking with her son, stopping by the school five to six times a week and glancing into the rooms, and speaking with her son's providers and case manager. Pl. Facts, Ex. E at p. 240. The court does not decide whether some or all of her testimony is admissible because the alleged violations do not comprise an ADA violation. For purposes of this motion, the court assumes the school did not comply with Brown's IEP as detailed by his mother.

receive written lecture notes. *Id.* Before- and after-school tutoring was available to him, but he did not attend. Def. Facts ¶ 41. He was provided extra time to complete his assignments if necessary and was given the option to retake tests. *Id.* ¶ 43. Brown was responsible for scheduling a retake, but he rarely scheduled any. *Id.* Brown's mother complained about the lack of special education teachers in Brown's classes and other failures to Brown's teachers and high-level administrators of the Chicago Public Schools. Pl. Facts ¶ 20. The school allowed Brown to retake all of his exams from his freshman and sophomore years. Def. Facts ¶ 43.

In his junior year, Brown's IEP followed the same model of placing him in general education class with support from a special education teacher in his core academic classes five days a week and other accommodations. Pl. Facts. ¶ 22. The IEP required that Brown be allowed to test with a special education teacher in his core academic classes, retake tests, receive a reduced assignment load, and receive verbal testing and assignments. *Id.* ¶ 22. It also allowed Brown to use a calculator and highlighters. *Id.* ¶ 23. Brown did not receive all these services and accommodations. *Id.* At school, he was allowed to use the computer programs Write Out Loud and Co-Writer, and he received a Franklin Speaking Dictionary and Thesaurus for home use. Def. Facts ¶¶ 26, 45. He used the software at school only twice and attended the after-school tutoring available to him two or three times. Def. Facts ¶¶ 27, 41. Brown was graded on a modified scale in which a 50% earned him a passing grade of D instead of the 75% other students needed. *Id.* ¶ 42.

At some point in his junior year, Brown was removed from his general education English class and placed in a special education class for the remainder of the year. Pl. Facts ¶ 25; Def. Resp. to Pl. Facts ¶ 25. The general education English teacher objected to the special education

9

teacher in her classroom giving a lot of one-on-one attention to students. Pl. Facts ¶ 25 & Ex. D at 37-40. In one instance, the general education teacher refused to accept an in-class assignment Brown had completed with the help of the special education teacher.[6] *Id.* ¶ 25.

In October 2008, Brown's mother requested *pro se* a due process hearing. Def. Facts ¶ 13; Pl. Facts ¶ 32. After the March 2009 hearing, the hearing officer partially ruled in Brown's favor, finding that he was denied all special education services for the first three weeks of September 2008; he did not receive the full five days of support by a special education teacher in his classroom for several months; and he did not receive paraprofessional support to ensure his timely arrival to class during his sophomore year. Pl. Facts ¶ 32 & Ex. B at 4, 7. The hearing officer ordered 80 hours of one-on-one tutoring as compensatory education. Def. Facts ¶ 18; Pl. Facts ¶ 33. The hearing officer otherwise ruled against Brown on his claims that he was denied the modifications, accommodations, and services required by his IEP, and concluded "the student's failure is the result of his excessive absences from class and tardiness to class, failing to complete homework assignments, sleeping during class, talking to other students during class, not completing required assignments or otherwise not being engaged in his education." Def. Facts ¶ 18; Def. Resp. to Pl. Fact ¶ 32. A hearing officer's findings are not entitled to deference in an ADA claim. *Bd. of Educ. v. Ross*, 486 F.3d 267, 278 (7th Cir. 2007).

Brown then filed this lawsuit, though his mother acting *pro se*. The court appointed an attorney to represent Brown. Before the court is the school board's motion for summary judgment.

---

[6] Brown asserts the general education teacher "balled up the paper and threw it in the trash," but the underlying deposition testimony actually states Brown balled up the paper and threw it away after the teacher did not accept it. Pl. Facts ¶ 25 & Ex. D at 39-40.

B. Analysis

Summary judgment is appropriate if the record evidence creates no genuine issue of material fact and judgment is appropriate at a matter of law. FED. R. CIV. P. 56(a); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861 (7th Cir. 2010).

The school board argues Brown cannot establish that he was denied educational services because of his disability under any of the three ways to prove discrimination.[7] First, the board asserts Brown has no evidence of intentional discrimination based on his disability. Second, it contends Brown has not shown the school board refused to provide him an IEP to accommodate his disability, and asserts a disagreement about the IEP is insufficient for ADA liability without evidence of bad faith or gross misjudgment. Finally, the school board argues Brown has no evidence a school board policy affected him disproportionally in relation to nondisabled students. Brown responds that he provided sufficient evidence that the school knew of his disability but repeatedly disregarded the accommodations required by his IEP. In particular, Brown points to the incident in which his English teacher refused to accept his assignment, and he asserts that teacher otherwise refused to provide him with services because of a bias against special education students.

Title II of the ADA requires Brown to prove that (1) he is a "qualified individual with a disability," (2) who was "excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or [was] subjected to discrimination," and (3) the

---

[7] The school board also argues in a footnote that Brown has not shown he is disabled under the ADA. The fact that Brown qualifies for services under the IDEA does not automatically entitle him to protection under the ADA. *See Ellenberg v. N.M. Military Inst.*, 572 F.3d 815, 820-21 (10th Cir. 2009). However, other reasons preclude Brown's recovery under the ADA. The court assumes Brown is disabled under the ADA for purposes of this motion.

11

deprivation was "by reason of" his disability. 42 U.S.C. § 12132; *Foley*, 359 F.3d at 928. Brown may show the second element with evidence (1) the school acted intentionally on the basis of the disability; (2) the school refused to provide a reasonable modification; or (3) a rule disproportionally impacts the disabled. *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999).

Brown may not base his ADA claim solely on a failure to properly implement his IEP, nor is a violation of the IDEA on its own enough to establish an ADA violation. The ADA is concerned with differential treatment between the disabled and the nondisabled, not with the general provision of services to the disabled. *See Mark H. v. Lemahieu*, 513 F.3d 922, 936 (9th Cir. 2008); *N.L. v. Knox County Sch.*, 315 F.3d 688, 695 (1st Cir. 2003); *Sellers ex rel. Sellers v. Sch. Bd.*, 141 F.3d 524, 528-29 (4th Cir. 1998); *Timms ex rel. Timms v. Metro. Sch. Dist.*, 722 F.2d 1310, 1317-18 (7th Cir. 1983). Because of the focus on differential treatment, an underlying assumption is that nondisabled students are entitled to the benefit he seeks. However, no nondisabled student has an IEP; without a disability, Brown would not qualify for an IEP or for protection under the IDEA. *Cf. Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (patient not otherwise qualified under Rehabilitation Act because "she would not have had any need for a feeding tube to deliver nutrition and hydration but for her medical condition"); *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 120-23 (7th Cir. 1997) (psychiatric patient not "otherwise qualified" to receive benefit of psychiatric treatment because "absent her handicap, she would not have been eligible for treatment in the first place"). The ADA instead protects a broader benefit: access to the education nondisabled students receive. *Mark H.*, 513 F.3d at 937.

12

The relevant question is not whether the school denied Brown a service he is entitled to under his IEP. Rather, the inquiry is whether the denial of that service affected Brown's access to education in relation to nondisabled students. *See Mark H.*, 513 F.3d at 936 (Rehabilitation Act regulations in educational setting "require[] a comparison between the treatment of disabled and nondisabled children, rather than simply requiring a certain set level of services for each disabled child"). Of course, a denied service could be shown to result in the denial of access to education. However, that result is not automatic. An IEP is designed to provide a free appropriate public education as defined by Congress in the IDEA. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 187-200 (1982) (discussing congressional intent in interpreting "free appropriate public education"); *Mark H.* 513 F.3d at 928. The Rehabilitation Act regulations define a free appropriate public education differently. "The most important differences are that, unlike [free appropriate public education] under the IDEA, [free appropriate public education] under § 504 [of the Rehabilitation Act] is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program." *Mark H.*, 513 F.3d at 933. Although regulations provide that a valid IEP establishes compliance with the Rehabilitation Act, 34 C.F.R. § 104.33(b)(2), the converse is not true. *Miller ex rel. S.M. v. Bd. of Educ.*, 565 F.3d 1232, 1246 (10th Cir. 2009) ("The mere fact that complying with the IDEA is *sufficient* to disprove educational discrimination does not mean that every violation of the IDEA necessarily *proves* a discrimination claim" )(emphasis in original)); *Mark H.*, 513 F.3d at 933.

13

It is necessary to consider carefully whether the services Brown was allegedly denied prevented his access to education.[8] It is undisputed Brown was unsuccessful in high school, receiving mostly Ds and Fs, despite having the aptitude to succeed. Assuming Brown's failing grades demonstrate that he was denied access to education, the central issue is whether he was unsuccessful because the school failed to provide him reasonable accommodations or whether he was unsuccessful because he did not avail himself of the opportunity given to him by missing class, arriving late and unprepared, and not participating when he was in class. This inquiry is important because the school board is liable only if Brown was denied access to education by reason of his disability and not because of his insufficiencies as a student. *See* 42 U.S.C. § 12132.

Brown has no evidence that any of the missing services contributed to his failure. It is his burden to prove that "his disability is what causes his deprivation of the services or benefits desired." *Wisc. Comm. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006) (*en banc*). Brown suggests the court should infer that had the school fully complied with his IEP, he would have passed his classes. However, he has pointed to no record evidence to support a reasonable inference of causation. For example, he did not discuss his performance on the days when a special education teacher was present compared to when one was not present. Nor has he

---

[8] The school board argues Brown must show the school acted in bad faith or gross misjudgment in implementing the IEP. Several circuits have adopted this requirement. *See, e.g., Sellers ex rel. Sellers v. Sch. Bd.*, 141 F.3d 524, 529 (4th Cir. 1998); *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982). The Seventh Circuit has not. *See Hamilton Sch. Dist. v. Doe*, No. 04 C 876, 2005 WL 3240597, at *12 (E.D. Wisc. 2005) (Callahan, Mag. J.) (the court "is not aware of any Seventh Circuit case that expressly adopts the 'bad faith or gross misjudgment' formula" but choosing to apply it anyway). This court declines to apply a bad faith or gross misjudgment standard.

contrasted his performance on tests when instructions were given orally with results when instructions were written. In fact, he has not submitted any evidence showing why he failed his classes. Although the court must draw all reasonable inferences in Brown's favor, he must present some evidence to connect his asserted claims (missing IEP services) to the effect (failed classes).

The same causation analysis is not applicable to the decision to move Brown to a self-contained English class his junior year, a claim that falls more easily in the ADA context. The deprivation is complete exclusion from a regular education English class, rather than the denial of an amorphous access to education. Brown's IEP is evidence that, with accommodations, he is qualified to participate in a regular English class, a benefit that nondisabled students have. The deposition of his special education English teacher is sufficient to imply that he left the regular education English class because the regular education teacher was hostile to the accommodations Brown needed to participate. It appears he has raised a genuine issue of material fact as to whether he was improperly excluded from a regular English class. However, the IDEA requires plaintiffs to exhaust administrative remedies under the IDEA, even for ADA claims, if the complained-of acts have "both an educational source and an adverse educational consequence." *Charlie F. ex rel. Neil F. v. Bd. of Educ.*, 98 F.3d 989, 991-93 (7th Cir. 1996); *see* 20 U.S.C. § 1415(*l*). The exhaustion requirement allows the school the first chance at remedying a violation before the student turns to the courts. *Id.* at 992-93. Brown did not raise an administrative claim based on exclusion from a regular English class. Represented at the hearing by his mother, he need not have specifically mentioned the ADA or discrimination at the hearing. But he was required to present the issues underlying his ADA claim so that the hearing officer

15

had the opportunity to consider a remedy. The hearing officer found that Brown was transferred out of his regular education English class without following proper procedure. However, nothing in the report suggests Brown challenged the transfer decision or relied on the transfer as a basis for relief. *See generally* 2d Am. Compl., Ex. A (Impartial Due Process Hearing Decision). He was moved from the class only a few weeks before the hearing, but he did not ask to be returned to the regular education class or contest his placement in a special education English class. Accordingly, he failed to exhaust administrative remedies under the IDEA on this claim.

### III. Conclusion

For the foregoing reasons, the school board's summary judgment motion is granted.

ENTER:

*[signature: Suzanne B. Conlon]*

Suzanne B. Conlon
United States District Judge

December 27, 2010